Filed 1/23/23  In re B.C. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re B.C., a Person Coming Under the Juvenile Court Law. | B320707, B319134 (Los Angeles County Super. Ct. No. 19LJJP00100B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. J.C., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Stephanie Davis, Judge. Affirmed.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn Harrison, Interim County Counsel, Kim Nemoy, Assistant County Counsel, and Melania Vartanian, Deputy County Counsel, for Plaintiff and Appellant.

———————————————

B.C. was removed from parental custody shortly after birth. His father, appellant J.C. (Father), engaged in domestic violence; his mother, A.T. (Mother), abuses drugs. Reunification services ended after the parents ignored court orders. The court denied Father's petitions for modification and terminated parental rights. (Welf. & Inst. Code, §§ 388, 366.26.)[1]

The court did not abuse its discretion by denying requests for modification without a hearing. Father did not bond with B.C. during the first year of the child's life. By the time Father started to visit B.C. regularly and participate in programs, it was too late: B.C. was fully bonded with his prospective adoptive parents and cried inconsolably when he was separated from them to visit Father. Father failed to make a prima facie showing that modification would serve B.C.'s best interests. We affirm.

**FACTS AND PROCEDURAL HISTORY**

Soon after his birth in August 2020, B.C. was detained by respondent Los Angeles County Department of Children and

---

[1] Unlabeled statutory references are to the Welfare and Institutions Code. We consolidated Father's appeals from orders denying modification and terminating parental rights. Father did not brief the merits of the order terminating parental rights. Mother is not a party to the appeal.

2

Family Services (DCFS). He was at high risk for abuse or neglect. Mother is a chronic drug user who failed to reunify with her son A.O., born in 2012. Mother told DCFS that Father provided her with drugs.

Mother sustained visible neck injuries when Father choked her in December 2019. He was arrested for domestic violence, but Mother refused to participate in a criminal case against him. Father is on probation for a 2019 accessory to a drive-by shooting conviction. Mother and the maternal grandmother (MGM) said that Father has "anger issues."

DCFS's petition alleged that B.C.'s parents have a history of violent altercations in which Mother scratched and hit Father, and Father was arrested for choking Mother; Mother is unable to care for a newborn because she has a history of using cocaine and hydrocodone and currently abuses opiates. The parents denied Indian ancestry. At the detention hearing, the court found no reason to know that B.C. is an Indian child. It found that Father is B.C.'s presumed father. It removed B.C. from both parents, placed him with his maternal grandparents (MGP's), and authorized monitored visits.

In the jurisdiction report, Mother said she scratched Father but denied that he choked her; they argue about her drug use. Father claimed he has never seen Mother under the influence and learned of her drug abuse when DCFS opened a case for A.O. He denied using drugs but failed to show up for testing.

Mother admittedly uses unprescribed Norco three to four times weekly. She began using drugs in middle school, trying "cocaine, ecstasy, Meth." She underwent a 14-day "detox" but never participated in a full treatment program. In 2019, during A.O.'s dependency case, Mother tested positive for cocaine and

3

hydrocodone, and failed to test 30 times. In 2020, she failed to test 18 times (while pregnant with B.C.) and tested positive for hydrocodone the only time she appeared.

MGM knows Mother's history "and believes [she] continues to take 'pills.' " MGM suspects that B.C. was "prenatally exposed to substances as she noticed possible signs of withdrawal" such as shaking, crying, and sleeplessness.

Father denied domestic violence, saying, "We do have history, not violent, but to others it might seem violent but I think it's like any other relationship." MGM said Father " 'is aggressive and violent.' " She fears for Mother's safety after seeing her with marks and bruises. Mother and Father live with the paternal grandparents.

On January 13, 2021, the court sustained allegations that Mother has a history of substance abuse and currently abuses opiates, limiting her ability to care for a young child; her son A.O. is a dependent of the court; Mother and Father have a history of violent altercations, resulting in Father's arrest; Mother failed to protect B.C. by allowing Father to reside with the child.

At disposition, B.C. was declared a dependent of the court and removed from parental custody. The parents were given monitored visits with B.C. for a minimum of nine hours weekly. Mother was ordered to participate in a drug program; drug testing; parenting education; and counseling. Father was ordered to participate in on-demand drug testing, on suspicion of drug use; a drug program if any test is missed; an anger management program; parenting education; and counseling to address domestic violence, anger, and substance abuse.

In July 2021, DCFS reported that B.C. is well-integrated into MGP's household. He has no bond with Father. The parents

4

did not inquire about B.C.'s progress or provide evidence of enrollment in any court-ordered program. Mother missed 20 consecutive drug tests. MGM reported that "the parents attend visits rarely"; Father "can't handle the baby"; and B.C. "does not know [Father]." MGM witnessed a parental altercation outside her home; a doorbell camera filmed Father striking Mother. When MGM told them to leave, Father pleaded with her not to call police because he is on probation. Parental visits last 30 to 45 minutes, not the allotted time of three hours. They have not visited B.C. recently.

The risks to 11-month-old B.C. remained high. The parents did not communicate with DCFS; participate in services; or visit B.C. consistently. MGM wishes to provide B.C. with permanency and stability through adoption. In August 2021, MGM told the social worker (CSW) she has not seen Mother " 'in a while.' " Mother called MGM, crying because she is in a violent relationship with Father. MGM heard Father's family yelling at Mother in the background.

A review hearing was held on September 13, 2021. Father complained that DCFS kept assigning new CSW's who did not call or e-mail him; he was given "false information"; "barely got to see" B.C.; was willing to drug test; was trying to sign up for classes; and felt he was being treated unfairly. B.C.'s attorney said that Father is "in total noncompliance." DCFS noted that the parents still cohabit, though this is a domestic violence case. Despite CSW's "continuous efforts" to text, e-mail and visit the parents, they did not respond. They were given referrals for programs, then evaded every effort to reach them to set up drug testing. Mother has a history of not engaging in services since A.O. was first detained.

The court concluded that DCFS "made reasonable efforts to engage both [ ] Mother and Father in services, and they have, for whatever reason, chosen not to engage in the services." Father's effort to blame DCFS fails: He was not abandoned. The parents recently engaged in domestic violence at MGP's home. The court found that returning B.C. to the parents would pose a substantial risk of harm; the parents have made no progress to alleviate the causes leading to B.C.'s removal; and they have not regularly or consistently visited B.C. There is no substantial probability that B.C. can return to either parent within the statutory period. The court terminated reunification services and set a permanent plan hearing. The court identified the likely plan as adoption.

CSW personally served Father with notice of the permanent plan hearing; Mother was inside the home but refused to be served. By November 2021, Mother was incarcerated.

In a January 2022 permanent plan report, DCFS wrote that Father began an anger management program in July 2021; the service provider recommended his continued attendance. He enrolled in a parenting class and planned to start counseling but missed many drug and alcohol tests. At visits, Father does not feed B.C., change his diaper, or ask about his progress. B.C. recently began to recognize Father, who he sees as a playmate. Father does not speak to anyone at MGM's home during visits, but texted MGM that he hates her. MGM was uncomfortable and asked CSW to find another monitor for Father. Since November 29, 2021, Father has visited B.C. two or three times per week, for one to three hours.

B.C. is meeting his developmental milestones in a stable environment with MGP's and two cousins. He eats well, is integrated into the household, and is strongly bonded with MGM

6

and others in the home.  He calls MGM "mama."  B.C. has lived with MGP's since he was a month old, and they are committed to raising him to adulthood.

Father filed a petition for modification (388 petition) in January 2022.  He asked to reinstate services or return B.C. to his care because he "is nearly done with the court ordered case plan."  He is in counseling and takes anger management and parenting classes.  Father claimed to have no problem testing for drugs and alcohol but said his work schedule interfered.  Father said he "is bonded to the child" and has visited consistently since November 2021.

In March 2022, DCFS reported that CSW monitored one of Father's visits.  He took no initiative to change B.C.'s diaper but watched MGM do so.  He attended 22 of 26 anger management classes; further participation was recommended.  He completed three of 12 parenting classes and six counseling sessions.  He has yet to appear for drug and alcohol tests.  Father visits B.C. two to three times weekly, staying for one and a half hours, not for the full three hours.  He is engaged during visits, but still does not feed or change B.C. or undertake any parental tasks relating to the child's needs.  He sent MGM an angry text after she refused a visit when he arrived late; MGM said she no longer wished to monitor visits because of Father's aggression.

Father told CSW that he needs to spend more time with B.C.  CSW opined that Father has not demonstrated what he is being taught in parenting classes.  Until recently, he did not visit B.C. consistently.  He stays for half of the allotted time.  He is attentive and playful, which B.C. enjoys.  B.C. does not fully engage with Father if MGM is not present.

7

After receiving reunification services in 2020, Father refused to meet with CSW to discuss the case plan, did not answer phone calls, text messages or e-mails, and canceled scheduled meetings with CSW. He was instructed to drug test but never did. His visits were sporadic; for months at a time, he had no contact with B.C. As an infrequent and unreliable visitor, Father has no bond with B.C., who cries when left with Father without MGM. He does not plan and prepare nutritious meals or snacks. He has never changed B.C.'s diaper. He cannot reunify with B.C. because he is in a volatile relationship with Mother, who never addressed her drug addiction. The court ended reunification services in September 2021.

Before the hearing, DCFS updated the court. A sign-in sheet showed that Father attended parenting classes since November 2021. He completed his anger management program. He attended eight counseling sessions since December 2021. Though he is making progress, his relationship with Mother creates a risk to B.C. Mother told MGM that Father and his family will provide for her when she is released from jail; Father puts money into her jail account; visits her; and he misses programs to attend Mother's criminal hearings. He does not attend all visits with B.C. and leaves early.

Father sought to establish a prima facie case at the hearing on March 14, 2022. There are changed circumstances because he has essentially completed the case plan and is no longer in a relationship with Mother. He sees B.C. as much as he can and there are no issues during visits. B.C.'s attorney joined with Father, saying he has "done a lot" while admitting that Father "is not helping" care for B.C. during visits, thereby avoiding "unpleasant tasks."

8

DCFS asserted that Father has not shown a prima facie case. He began services a year after the dependency case began. It is questionable if the parents have ended their relationship, as Father continues to support Mother. Father did not drug test on demand; after missing multiple tests, he is required to complete a substance abuse program, per the case plan, but has not enrolled in one. Despite parenting classes, he still cannot change a diaper. There is no showing that his counselor is addressing domestic violence, anger management, and substance abuse with him. There is no showing that modification is in B.C.'s best interests, after spending his life with MGM. Father arrives briefly for play dates with B.C. Permanency should not be delayed while waiting for Father to become fit.

The court found it "more likely than not that the Father remains in a relationship with the Mother." It deemed "incredible" their claim to have suddenly ended the relationship, when Father continues to support Mother financially and emotionally. Father began court-ordered programs in 2021, "but his actions indicate that he has not gained any insight into his dysfunctional relationship with the Mother," preventing him from reunifying or showing a change in circumstances. As for B.C.'s best interest, Father cuts his visits short "and engages only in playing at the visitation. Clearly, he has not gained any insight [from] his participating in a parenting program and the minor is not benefitting from the Father's visits if the Father refuses to participate in [his] care . . . . No bond is able to develop between the minor and Father, and he's acting as a mere playmate for the minor." The court concluded that Father has not shown a prima facie case and denied the 388 petition. Father appealed the order on March 15, 2022.

DCFS reported in May 2022 that "[t]his case is adoption ready." B.C. follows MGM around and calls her "mama." The family has a strong bond. Mother has not seen B.C. since her incarceration in November 2021. Father spends more time with B.C. In visits monitored by DCFS, B.C. cried and screamed for MGM; tried to flee the visitation site; and cried and refused to leave MGM's car when he saw Father at a public location. Visits had to be cut short, due to B.C.'s distress. Father completed a parenting program. He fed B.C. and changed his diaper.

Father filed a second 388 petition on May 9, 2022, citing his completion of the case plan; continued counseling; a negative drug test; and active role during visits. He visits consistently, for longer, since the court denied his first petition in March. He brings snacks, changes diapers, and provided MGM with wipes, diapers, formula, clothing, and toys. He "maintained consistent, loving contact with his child and Father believes he and his child have a bond." He has ended communication with Mother.

At the hearing on May 11, 2022, Father argued that he made a prima facie case of changed circumstances. DCFS responded that its position is unchanged in the two months since the first 388 petition. Father cannot derail permanency for a child who was detained weeks after birth and is almost two years old. Father is only now starting to stay for three-hour visits, which were granted in 2020. B.C. cries inconsolably during the visits, showing his best interests are not served. Father missed numerous drug tests and must complete a full drug program.

The court stated that though Father now changes diapers and feeds B.C., the problem is that he never tried to establish a bond during B.C.'s first year. It said, "This is not about him asserting himself as the child's parent. It is about . . . whether or

not there is a bond and whether or not it would be in the child's best interest to try and further that relationship."

The court referenced its findings from the first 388 petition in deciding if new evidence supports a hearing. It found "there is no connection between the minor and the father." As to B.C.'s best interest, the court emphasized "the length of time the child has been in the placement, the bond that is established with the caregiver, the lack of bond that is established with the father, the fact that he has not [in two years] parented the child . . . for a significant period of time to establish any kind of relationship or bond." It denied the petition without a hearing.

The court moved to the permanent plan hearing. The parents objected to the termination of their rights and requested a less drastic plan. B.C.'s counsel supported termination of parental rights. The court found that B.C. is adoptable and no exception to adoption applies. It terminated parental rights. Father appealed.

## DISCUSSION

Father challenges summary denials of his section 388 petitions. The orders are appealable and reviewed for abuse of discretion. (§ 395; *In re Jasmon O.* (1994) 8 Cal.4th 398, 415 (*Jasmon*); *In re Anthony W.* (2001) 87 Cal.App.4th 246, 250 [summary denial of 388 petition].) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.)

"[T]he welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307 (*Marilyn*).) Reunification services are limited to reduce "the length of time a child has to wait for a parent to become adequate." (*Id.* at p. 308.) When, as

11

here, a newborn is removed from custody, a parent presumptively receives six months of services "but no longer than 12 months from the date the child entered foster care." (§ 361.5, subd. (a)(1)(B).) Services may be extended only if there are reasons to believe that the child can be safely returned to parental custody within the extended period. Services are "first presumed, then possible, then disfavored." (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 845.)

B.C. entered foster care December 29, 2020.[2] The court instituted reunification services in January 2021 and ended them in September 2021. In that time, Father made no progress to resolve the problems that led to this proceeding. He did not regularly visit B.C. or enroll in court-ordered programs. There was no substantial probability that B.C. could safely return to Father's custody.

Once reunification services end, the primary focus is on the child's need for permanency; a parent's interest in the custody, care, and companionship of the child is not paramount. (*Marilyn*, *supra*, 5 Cal.4th at pp. 309–310; *In re Angel B.* (2002) 97 Cal.App.4th 454, 464.) Children have a fundamental right to a placement that is stable and permanent. (*Jasmon*, *supra*, 8 Cal.4th at p. 419.) Termination of services "ordinarily constitutes a sufficient basis for terminating parental rights." (*In re K.C.* (2011) 52 Cal.4th 231, 236–237.)

A 388 petition must demonstrate "a substantial change in circumstances" such that modification will promote the child's

---

[2] A child enters foster care on the date of the jurisdictional hearing or 60 days after his or her initial removal, whichever is earlier. (§ 361.49.) Sixty days from B.C.'s detention hearing is December 29, 2020.

best interests. (*In re Heraclio A.* (1996) 42 Cal.App.4th 569, 577.) " 'A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent . . . might be able to reunify at some future point, does not promote stability for the child or the child's best interests.' " (*In re Mary G.* (2007) 151 Cal. App.4th 184, 206.) To decide a 388 petition, the court may consider the entire history of the case. (*In re Jackson W.* (2010) 184 Cal.App.4th 247, 258; *In re Justice P.* (2004) 123 Cal.App.4th 181, 189.) No hearing is required if a petition fails to show (1) changed circumstances and that (2) a modification will promote the child's best interests. (*In re Christopher L.* (2022) 12 Cal.5th 1063, 1080; Cal. Rules of Court, rule 5.570(d).)

From September 2020 to September 2021, Father did little except avoid contact with DCFS. He seldom visited B.C. The classes he took, once services ended, had no measurable effect. Despite a parenting program, Father did not parent B.C. Their relationship was shallow and discomfiting to B.C.

Apart from Father's lack of progress throughout the proceeding, he "did not state he was currently able to provide [B.C.] a stable, safe, permanent placement. He sought only to continue the dependency proceedings, which had been initiated [over a year] earlier. 'Childhood does not wait for the parent to become adequate.' [Citation.] This showing of changing circumstances is not sufficient." (*In re A.S.* (2009) 180 Cal.App.4th 351, 358.) Absent a showing that Father could presently provide B.C. with a safe, permanent home, an extension of the proceeding was unwarranted.

Father's petitions state that he is bonded with B.C., or believes they have a bond, and has consistently visited since

13

November 2021. Notably, he did not disclose why additional services would be in B.C.'s best interests. In determining a child's best interest, the court considers (1) the seriousness of the reason for dependency jurisdiction; (2) the strength of the bonds between the child, the parent, and the caretakers; and (3) whether the problems leading to dependency may be easily removed or ameliorated. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530–532.)

B.C. was removed from Father for serious reasons. He engaged in domestic violence and was arrested for choking Mother, who had visible injuries. Mother and MGM said he has "anger issues." MGM said Father is "aggressive and violent." Father acknowledged that his relationship with Mother "might seem violent" to others, though he thought it is normal.

The record shows that Father's behavior is not easily ameliorated. In 2021, during this proceeding, MGM witnessed a parental altercation at her home, in which Father struck Mother; he begged MGM not to report him and endanger his probationary status for his drive-by shooting conviction. After that incident, Mother called MGM crying because of Father's violence. MGM twice asked to be relieved of monitoring Father's visits because he sent her hostile, angry messages that unnerved her, despite his participation in an anger management program.

B.C. does not have a bond with Father. He is bonded with MGP's, where he has lived since he was a month old; they are the only parents he knows. Father's visits, for the first year of B.C.'s life, were inconsistent. Months passed without a visit. As late as July 2021, B.C. did not even know who Father is. Even when Father began to visit regularly, he cut visits short, squandering time he could have used to deepen the relationship. During

14

visits, the two are playmates. Father never attended B.C.'s medical appointments or asked MGM about B.C.'s needs. He has not progressed to unmonitored visitation, let alone demonstrated ability to take custody. B.C. feels unsafe with Father and cries when they visit without MGM's comforting presence.

B.C.'s interest in permanency and stability outweighs the remote possibility of future reunification with Father. Though reunification is favored at the beginning of the dependency process, the opposite is true at the end of the process, when the child deserves a stable, permanent home. (*Jasmon O.*, *supra*, 8 Cal.4th at p. 420.) The court did not err by denying, without a hearing, Father's petitions to have custody of B.C. or receive additional services. The court's subsequent order terminating parental rights was not premature. Father does not deny that the legislative preference for adoption applies here.

**DISPOSITION**

The orders are affirmed.

NOT TO BE PUBLISHED.

                                             LUI, P. J.

We concur;

ASHMANN-GERST, J.

CHAVEZ, J.